**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**In re:**

**ACM DEVELOPMENT, LLC,**

**CASE NO. 6:22-bk-00210-LVV**
**CHAPTER 11**

**Debtor.**

_____________________________________/

**ACM DEVELOPMENT, LLC.**

**ADV. PROC. NO. 6:22-ap-**

**Plaintiff,**

**v.**

**LIBERTAS FUNDING, LLC,**

**Defendant.**

_______________________________________/

**COMPLAINT TO AVOID AND RECOVER TRANSFERS, TO DETERMINE THE EXTENT, VALIDITY, AND PRIORITY OF LIENS, AND TO OBJECT TO CLAIM**

Plaintiff, **ACM DEVELOPMENT, LLC,** a Florida limited liability company ("ACM"), by and through its undersigned counsel, hereby sues **LIBERTAS FUNDING, LLC** ("Libertas"), and as grounds therefore states as follows:

**PARTIES, JURISDICTION AND VENUE**

1. This is an action to avoid and recover preferential transfers and constructive fraudulent transfers.

2. Additionally, this is an action to object to Defendant's claim against ACM and to determine the extent, validity, and priority of liens.

3. ACM is a site development contractor doing business in Central Florida since 2008.

4. Libertas is a New York limited liability company engaged in the receivable financing business.

5. This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1334.

6. The matters herein are core proceedings pursuant to 28 U.S.C. § 157(b).

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

8. All conditions precedent have occurred, have been satisfied, or have otherwise been waived.

## GENERAL ALLEGATIONS

9. On or about August 30, 2021, ACM and Libertas entered into an Agreement of Sale of Future Receipts (the "Agreement") wherein ACM agreed to sell a specified amount of its future receivables from customers (the "Future Receipts") in exchange for a certain purchase price (the "Purchase Price") from Libertas. A true and correct copy of the Agreement is attached hereto as **Exhibit "A"**. The Agreement is characterized as a true and complete sale.

10. Pursuant to the Agreement, Libertas was authorized to collect the Future Receipts from ACM via weekly ACH electronic debits.

11. The Agreement does not clearly define which customer receivables Libertas was entitled to receive.

12. The Agreement purportedly grants Libertas a security interest in ACM's right, title, and interest in all accounts, deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, inventory, and proceeds.

13. On or about September 8, 2021, ACM and Libertas entered into a Supplemental Agreement (the "Supplement") whereby ACM agreed to sell certain future receivables from customers in exchange for further monies from Libertas. The Supplement is attached hereto as **Exhibit "B"**.

14. To secure the performance of the Supplement, Libertas was purportedly granted a security interest in all of ACM's tangible and intangible property, any and all amounts owed from merchant processing companies, and any and all insurance proceeds from the sale, destruction, or loss of ACM's tangible and intangible property.

15. On or about September 10, 2021, Libertas, through C T Corporation System, filed its UCC-1 Financing Statement. The UCC-1 is attached hereto as **Exhibit "C"**.

16. Between September 2021 and November 2021, Libertas received approximately $382,403.35 from ACM (the "Transfer" or "Transfers").

17. On January 20, 2022 (the "Petition Date"), ACM filed its voluntary petition for relief (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, pending as Case No. 6:22-bk-00210-LVV.

18. On June 13, 2022, ACM filed its Plan of Reorganization (the "Plan") in the Bankruptcy Case.

19. Pursuant to the Plan, ACM provided that (1) Libertas would retain its lien on ACM's property to the same extent, validity, and priority as the Petition Date and (2) proposed to repay Libertas its Allowed Claim over a twenty-five (25) year term at 4% interest.

20. On October 26, 2022, this Court entered an Order Confirming ACM's Plan of Reorganization, as Modified, (the "Order") in the Bankruptcy Case.

**COUNT I – AVOIDANCE OF PREFERENTIAL TRANSFERS**

21. ACM realleges and incorporates the allegations of paragraphs 1 through 20 above as though fully set forth herein.

22. Between October 22, 2021, and January 20, 2022 (the "Preference Period"), ACM made Transfers to or for the benefit of Libertas in an aggregate amount not less than $40,000.00.

23. Each Transfer was made from ACM and constituted a transfer of an interest in property of ACM.

24. Libertas was a creditor of ACM at the time each Transfer was made by virtue of the Agreement and Supplement.

25. Each Transfer was to or for the benefit of a creditor within the meaning of Section 547(b)(1) of the Bankruptcy Code because each Transfer either reduced of fully satisfied a debt or debts then owed by ACM to Libertas.

26. Each Transfer was made for, or on account of, an antecedent debt or debts owed by ACM to Libertas before such transfers were made.

27. Each Transfer was made while the ACM was insolvent.

28. ACM is entitled to the presumption of insolvency pursuant to 547(f) of the Bankruptcy Code.

29. As a result of each Transfer, Libertas received more than it would have received if: (a) ACM's Chapter 11 case was under Chapter 7 of the Bankruptcy Code; (b) the Transfers had not been made; and (c) Libertas received distributions on account of its debts under the provisions of the Bankruptcy Code.

30. In accordance with the foregoing, each Transfer is avoidable pursuant to Section 547(b) of the Bankruptcy Code.

31. ACM has conducted reasonable due diligence in the circumstances of this case and has considered all reasonably knowable affirmative defenses under Section 547(c) of the Bankruptcy Code.

**WHEREFORE**, ACM requests this Court enter a judgment in favor of ACM and against Libertas: (1) avoiding the preferential transfers and (2) granting such other and further relief the Court deems appropriate.

**COUNT II – AVOIDANCE OF FRAUDULENT CONVEYANCES**

32. ACM re-alleges and re-states its allegations set forth in paragraphs 1 through 20 as if fully set forth herein.

33. ACM pleads in the alternative that Libertas did not receive reasonably equivalent value in exchange for each Transfer.

34. ACM was insolvent as of the date of each Transfer or become insolvent as a result of the Transfers.

35. Based on the foregoing, the fraudulent transfers are avoidable pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

**WHEREFORE**, ACM requests this Court enter a judgment in favor of ACM and against Libertas: (1) avoiding the fraudulent transfers and (2) granting such other and further relief the Court deems appropriate.

**COUNT III - RECOVERY OF AVOIDED TRANSFERS**

36. ACM realleges and incorporates the allegations of paragraphs 1 through 35 above as though fully set forth herein.

37. ACM is entitled to avoid the preferential transfers pursuant to Section 547(b) of the Bankruptcy Code, or in the alternative, the fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

38. Libertas was the initial transferee of the avoidable transfers or the person for whose benefit the avoidable transfers were made.

39. Accordingly, pursuant to Section 550(a) of the Bankruptcy Code, ACM is entitled to recover from Defendant the avoidable transfers, plus interest thereon and the costs of this action.

**WHEREFORE**, ACM requests this Court enter a judgment in favor of ACM and against Libertas: (1) directing Libertas to return to ACM the amount of the preferential transfers and/or fraudulent transfers, together with interest at the maximum legal rate and attorneys' fees, and (2) granting such other and further relief the Court deems appropriate.

## COUNT IV – OBJECTION TO CLAIM

40. ACM realleges and incorporates the allegations of paragraphs 1 through 39 above as though fully set forth herein.

41. Libertas is a transferee of avoidable transfers under Sections 547 and/or 548 of the Bankruptcy Code, which property is recoverable under Section 550 of the Bankruptcy Code.

42. Libertas has not paid the amount of the avoidable transfers, or turned over such property, for which Libertas is liable under Section 550 of the Bankruptcy Code.

43. Pursuant to Section 502(d) of the Bankruptcy Code, any and all claims of Libertas against ACM must be disallowed until such time as Libertas pays to ACM an amount equal to the aggregate amount of the avoidable transfers, plus interest and costs thereon.

44. Pursuant to Section 506(j) of the Bankruptcy Code, any and all claims of Libertas previously allowed by ACM must be reconsidered and disallowed until such time as Libertas pays to ACM an amount equal to the aggregate amount of the avoidable transfers, plus interest and costs thereon.

**WHEREFORE**, ACM requests this Court enter a judgment in favor of ACM and against Libertas: (1) disallowing Proof of Claim 3-1 filed by Libertas in the Bankruptcy Case and (2) granting such other and further relief the Court deems appropriate.

## COUNT V - DETERMINATION OF EXTENT, PRIORITY, AND VALIDITY OF LIEN

45. ACM realleges and incorporates the allegations of paragraphs 1 through 20 above as though fully set forth herein.

46. ACM disputes the extent, validity, and priority of Libertas' purported lien on ACM's tangible and intangible property because: (1) Libertas failed to identify which future receivables are the subject of the Agreement and Supplement; (2) Libertas cannot have a blanket lien on Debtor's property due to the nature of the sale; and (3) Libertas did not properly perfect its security agreement by filing the UCC-1 Financing Statement.

47. Additionally, pursuant to the Debtor's confirmed Plan, Libertas holds a purported lien on the Debtor's property that is inferior to the liens of creditors in Classes 1, 2, and 4-13. The total value of the claims in Classes 1, 2, and 4-13, exceeds the total value of the Debtor's property.

48. ACM seeks a declaratory judgment that Libertas does not hold a lien on any of Debtor's property.

49. ACM has a bona fide need for a declaration from the Court regarding Libertas' alleged lien on Debtor's property to facilitate the administration of the Bankruptcy Case.

50. A judicial declaration is necessary to resolve ACM's dispute over Libertas' relative lien rights.

**WHEREFORE**, ACM requests this Court enter a judgment in favor of ACM and against Libertas: (1) declaring Libertas does not retain a lien on any of the Debtor's property; and (2) granting such other and further relief the Court deems appropriate.

**RESPECTFULLY SUBMITTED** on this 15th day of November, 2022.

/s/ Justin M. Luna
**Justin M. Luna, Esq.**
Florida Bar No.: 0037131
jluna@lathamluna.com
Latham, Luna, Eden & Beaudine, LLP
201 South Orange Avenue, Suite 1400
Orlando, Florida 32801
Tel: (407) 481-5800
Fax: (407) 481-5801
***Attorneys for ACM Development, LLC***

# EXHIBIT “A”

LIBERTAS

**Libertas Funding LLC**
411 West Putnam Ave Suite 220, Greenwich, CT 06380

## AGREEMENT OF SALE OF FUTURE RECEIPTS

This **AGREEMENT OF SALE OF FUTURE RECEIVABLES** (this "Agreement") dated as of **08/30/2021**, is made by and between **Libertas Funding LLC**, a Connecticut Limited Liability Company as purchaser ("Purchaser"), the merchant whose name, address and other pertinent information is set forth below, as seller ("Merchant"), and the individual owner/guarantor of the Merchant whose name, address and other pertinent information are set forth below ("Guarantor"). For good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement agree as follows:

**Merchant Information (see addendum)**

| | |
|---|---|
| **Merchant Legal Name:** ACM DEVELOPMENT, LLC, et al. | **DBA Name:** ACM Development |
| **Entity Type:** Limited Liability Company | **FEIN:** *****2332 |
| **State Of Incorporation:** FL | **Bank Name:** PINNACLE BANK |
| **Address:** 562 BOWNESS AVE, OCOEE,FL, 34761 | **Phone:** 4073473353 |

**OWNER INFORMATION (referred to individually or collectively as the ("Owner"))**

| | | |
|---|---|---|
| **Name of Owner Guarantor 1:**<br>ERIC RAY MYNHIER | **Cell Phone:** 321-624-3256 | **Social Security #:** *****2146 |
| **Home Address:** 849 OAKLAND PARK BLVD | **City/State:** WINTER GARDEN, FL | **Zip Code:** 34787 |
| **Ownership %:** 100 | **Email:** Eric@acmdev.net | |

## PRIMARY TERMS

THIS AGREEMENT INCLUDES A JURY TRIAL AND CLASS ACTION WAIVER. PLEASE READ IT CAREFULLY.

In this Agreement, you are selling to us a specified amount of future payments your customers make for your goods and services, as further defined below ("Future Receipts"). We agree to buy from you (and you agree to sell to us) the amount of Future Receipts shown below (the "Amount Sold") in exchange for the "Purchase Price" shown below. In order to deliver to us the Amount Sold, you assign to us the share of your Future Receipts ("Specified Percentage") shown below, every week /day from the date we deliver the Purchase Price until we have received the entire Amount Sold and all fees or other amounts due under this Agreement (the "Completion Amount").

We are buying Future Receipts from you, not loaning you money. You are not required to pay interest on the Purchase Price and this Agreement has no term or required payment amounts that are not subject to change based on your future revenue. Instead, your obligation is to deliver to us the Specified Percentage of your Future Receipts as they are generated in the ordinary course of your business. This means that your obligation to us aligns with your cash flow. When your Future Receipts decline because business is slow, you will be able to deliver Future Receipts to us more slowly.

By purchasing Future Receipts from you, we assume risks such as not obtaining the Future Receipts we bought as quickly as we anticipated, or not receiving all of them if you go out of business. However, you are not allowed to engage in "bad acts" that unfairly prevent us from receiving what we paid for. For example, unless you cease operations, you are not allowed to change the bank account in which we collect our Weekly Delivery Amounts (see below) without our approval, block our ability to collect our Weekly Delivery Amounts, sell your Future Receipts to another funding company (stacking) or close your business and start up another similar business right away. Additionally, you are representing that the information that you provided us is accurate in all material respects and that you have not omitted providing us with information that is material to your business. The details on this are below.

## Detailed Terms and Conditions

**KEY BUSINESS TERMS AND DEFINITIONS:**

| | | |
|---|---|---|
| **Amount Sold** | $2,040,000.00 | The dollar value of Future Receipts that Merchant agrees to sell to Purchaser. |
| **Purchase Price** | $1,500,000.00 | The total amount that Purchaser agrees to pay for the Amount Sold. |
| **Future Receipts** | $2,162,500.70 | All sums received by or payable to Merchant from its customers as payment for Merchant's goods and/or services in the ordinary course of Merchant's business after Merchant receives the Purchase Price from Purchaser. Future Receipts include, among other things, payments by cash, physical or electronic checks, credit cards, charge cards, debit cards, other payment cards, ACH or other electronic payments, and any other form of funds transfer or payment. When the Payment Card Split Method of delivering Future Receipts is used, Purchaser will collect only Future Receipts processed through the Approved Card Processor (defined below). |
| **Direct Payments to Third Parties/Renewals** | N/A | Amounts paid to Purchaser and/or Other Funders. |
| **Total Amount Sent to Merchant** | $1,470,000.00 | The Purchase Price minus the Origination Fee (see below). |
| **Specified Percentage** | 20% | The percentage of Future Receipts that the Merchant is required to deliver to Purchaser until the entire Completion Amount is delivered to Purchaser in accordance with this Agreement. |
| **Weekly Delivery Amount** | $40,476.20 | The dollar amount that Merchant and Purchaser agree to be an approximation of the Specified Percentage of Future Receipts each week [day] as of the date of this Agreement, based upon the information provided by Merchant to Purchaser concerning Merchant's most recent receipts. |
| **Discount Factor** | 1.36 | The adjustment to the Amount Sold that enables us to calculate the Purchase Price. |
| **Origination Fees** | $30,000.00 | The amount Purchaser will deduct from the Purchase Price and retain to compensate it for due diligence and other costs in evaluating whether to purchase the Amount Sold. |
| **Repurchase Price (applicable discounts)** | 1.14 @ 1 month(s) 1.17 @ 2 month(s) 1.19 @ 3 month(s) 1.22 @ 4 month(s) 1.24 @ 5 month(s) | The discounted price Merchant may pay to end this financing transaction early by repurchasing Future Receipts sold to Purchaser but not yet delivered. The Repurchase Price is equal to the undelivered portion of the Amount Sold divided by the discount factor set forth in the column to the left for each month following the Commencement Date. |
| **Good Faith Estimate of Term** | 12 Months | This Agreement has no term. However, based on your historical revenue, we have estimated how long it will take you to deliver the Amount Sold to us under this Agreement. |
| **Commencement Date** | | The date when the Purchase Price is paid to Merchant. |
| **Business Day** | | Monday through Friday except bank holidays. |

**Note: The bold type terms in the tables above and below shall constitute defined terms with respect to this Agreement. PLEASE NOTE THAT THE PURCHASER WILL NOT TAKE MORE THAN THE EXPECTED WEEKLY REMITTANCE WITHOUT THE CONSENT OF THE MERCHANT.**

I. SALE OF FUTURE RECEIPTS; PAYMENT OF PURCHASE PRICE:

1. **Sale of Future Receipts; Not a Loan.** In exchange for the Purchase Price, Merchant hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") to Purchaser all of Merchant's right, title and interest in and to the Specified Percentage of its Future Receipts until the Completion Amount is delivered to Purchaser. This Sale is made without recourse against Merchant and Guarantor except as specifically set forth in this Agreement. By virtue of this Agreement, Merchant transfers to Purchaser full and complete ownership of the Amount Sold and Merchant retains no legal or equitable interest therein. Merchant and Purchaser agree that the Purchase Price is payment for the assignment and sale of the Amount Sold and that this transaction is not intended to be, nor shall it be construed as, a loan from Purchaser to Merchant. Furthermore, Purchaser's ability to collect the Amount Sold is contingent on the continued operation of Merchant's business, and the timing of deliveries of the Specified Percentage of Future Receipts will depend on how quickly Merchant's business generates Future Receipts.**Merchant and Guarantor expressly agree not to take the position that this transaction is a loan, and they expressly waive any and all claims and defenses based on that position in any action or proceeding arising out of this Agreement, including without limitation claims or defenses of usury.**

2. **Payment of Purchase Price.**
   a. Subject to the satisfactory completion of Purchaser's due diligence (in its discretion), Purchaser shall pay the Purchase Price minus the Origination Fee to Merchant promptly after the date of this Agreement, subject to Section 2(b) below.
   b. If Merchant previously sold Future Receipts to Purchaser but has not yet remitted the full Completion Amount pursuant to the prior transaction, Merchant hereby requests to repurchase the undelivered balance of the Amount Sold from that transaction and directs Purchaser to deduct the repurchase price from the Purchase Price and apply it to complete the prior transaction. Similarly, if Merchant previously obtained a loan from Purchaser and has a balance due on such loan, Merchant hereby instructs Purchaser to deduct the balance due on the

prior loan from the Purchase Price and apply it to pay off the prior loan. In the event that the agreement for the prior sale of Future Receipts does not permit repurchase of any portion of the amount sold, such agreement is hereby amended to permit repurchase on the same terms as set forth in this Agreement.

II. **DELIVERY OF AMOUNT SOLD:**

3. **Method of Delivery of Amount Sold.** Purchaser offers three methods by which Merchant may deliver the Specified Percentage of its Future Receipts to Purchaser: weekly ACH debits by Purchaser from Merchant's bank account, weekly remittances from Merchant's payment card processor, and a lockbox arrangement. Each of these methods is described below. The method to be used initially is specified on the first page of this Agreement. The method of delivery may be changed by written agreement between Purchaser and Merchant.

a.

Direct Debit Method.

Under the Direct Debit Method, Merchant agrees to deposit all Future Receipts into one (and only one) bank account which shall be preapproved by Purchaser (the "Approved Bank Account"). Merchant shall execute an ACH Authorization allowing Purchaser to debit directly from the Approved Bank Account each week the weekly Delivery Amount via ACH debit, as specified below.

b.

Payment Card Split Method.

Under the Payment Card Split Method, Merchant shall exclusively use a single Approved Card Processor (defined below) to process all payments made by credit, debit, and other payment cards for Merchant's goods and services. Merchant shall instruct such Approved Card Processor to remit weekly to Purchaser the Specified Percentage of the Future Receipts for that week, and to remit the balance (less any fees charged by the Approved Card Processor) to Merchant.

c.

Lockbox Method.

Under the Lockbox Method, Merchant agrees to deposit all Future Receipts into a special bank account established jointly by Purchaser and Merchant in accordance with a lockbox arrangement among Merchant, Purchaser and a banking institution chosen by Purchaser (the "Lockbox Account"), and Purchaser shall debit each week the weekly Delivery Amount from the Lockbox Account.

4. **Direct Debit Method and Lockbox Method Provisions.** The following terms apply if either the Direct Debit Method or the Lockbox Method is used, unless otherwise specified herein.

a. Weekly Delivery Amount. Purchaser and Merchant agree that, for efficiency purposes, Merchant may deliver the Specified Percentage of Future Receipts each week by remitting the WeeklyDelivery Amount, which Purchaser has calculated to be roughly equivalent to the Specified Percentage of Merchant's historical revenue each week. Purchaser, Merchant, and Guarantor acknowledge that Merchant's a ctual Future Receipts may vary each week or from Merchant's historical revenue, but they agree that the Weekly Delivery Amount is a fair and reasonable estimate of the Specified Percentage of Future Receipts. The Weekly Delivery Amount may be adjusted as set forth in Section 11. Merchant also has the right to reconcile any difference between the Weekly Delivery Amounts received in a given four-week period and the Specified Percentage of Future Receipts actually generated during that four-week period, as set forth in Sections 10 and 11.

At any time during the term of this Agreement, Purchaser may change the method by which it will accept the Weekly Delivery by providing Merchant with written instructions of a new method of delivery of Weekly Delivery to Purchaser.

5. **Timing of Weekly Deliveries.** Merchant hereby authorizes Purchaser to debit the Weekly Delivery Amount from the Approved Bank Account or the Lockbox Account, as applicable, via ACH or electronic checks once each week on the same day of the week as the Commencement Date. If a debit is scheduled to occur on a bank holiday, the debit shall be made on the following Business Day. Debits of the Weekly Delivery Amount shall commence on a date selected by Purchaser which shall be no later than 15 days following the Commencement Date. Weekly deliveries shall continue until Purchaser has received the Completion Amount, unless Merchant files for bankruptcy and/or goes out of business in the ordinary course, without first committing a Bad Act (as defined below). In the event that the final weekly delivery results in Purchaser receiving more than Amount Sold (not including fees), Purchaser shall refund any amount in excess of the Amount Sold (not including fees) within 5 business days of the final weekly delivery.

6. **Approved Bank Account.** If the Direct Debit Method is used, and for the purpose of allowing Purchaser to debit any fees due under this Agreement if the Payment Card Split Method is used, Merchant designates the bank account below as the Approved Bank Account, subject to approval by Purchaser. Merchant agrees to designate a different bank account acceptable to Purchaser if Purchaser does not approve the account designated below. In the event the Approved Bank Account becomes unavailable or Purchaser requests that a different bank account be used for any reason (such as difficulties debiting the Weekly Delivery Amount from such bank account), Merchant shall arrange for another Approved Bank Account immediately, and in no event later than five calendar days after the prior account becomes unavailable or Purchaser requests the designation of a new Approved Bank Account. If any weekly delivery (or multiple weekly deliveries) required under the Direct Debit Method does not occur due to a change in the Approved Bank Account, Purchaser may debit the missed weekly deliveries together with the next weekly delivery.
**Account Number:** 4002003756 **Routing Number:** 063114661

7. **Lockbox Account.**If the Lockbox Method is used, Merchant hereby authorizes Purchaser to initiate a lockbox arrangement and to instruct Merchant's Approved Card Processor and Merchant's invoiced customers/clients/vendees to deposit all sums due to Merchant from each of those parties directly to the Lockbox Account. If required, Merchant shall enter into a lockbox agreement with Purchaser and the banking institution chosen by Purchaser, and complete any additional paperwork, for the purpose of establishing the Lockbox Account.

8. **Third Party Appointment and Authorization.** By signing below, Merchant acknowledges that Purchaser may, at any time, at Purchaser's sole discretion, and without prior notice, appoint a third party, which may be an affiliate of Purchaser, including, without limitation, Kinetic Direct Funding, LLC (such third party being the "Servicing Agent") to perform any or all of the actions authorized by the ACH Authorization and the Agreement. Merchant further agrees and acknowledges that Servicing Agent shall have all of the same rights, responsibilities, and authorizations granted to Purchaser by the ACH Authorization and the Agreement. For purposes of clarity, any Servicing Agent may perform any and all activities to service the Agreement, including the collection of Future Receipts (as set forth above) and fees, as if it was the Purchaser.

9. **Fees Associated with Weekly Deliveries.** It shall be Merchant's exclusive responsibility to pay to its banking institution and/or Purchaser's

banking institution directly (or to compensate Purchaser if it is charged) all fees, charges and expenses incurred by either Merchant or Purchaser due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Merchant's banking institution of the transactions contemplated by this Agreement.

10. **Merchant's Right to Reconciliation of Weekly Deliveries.**

a. Merchant shall have the right, in its sole and absolute discretion but subject to the provisions of Section 11 below, to request retroactive reconciliation of any difference between the Weekly Delivery Amounts received by Purchaser through the four weekly deliveries immediately preceding the day when such request for reconciliation is received by Purchaser (each such four-week period, a "Reconciliation Month") and the Specified Percentage of Future Receipts actually generated during that Reconciliation Month.
b. Purchaser will perform each timely requested reconciliation (each, a "Reconciliation") within five (5) Business Days following its receipt of the Merchant's request for reconciliation by either crediting or debiting the difference back to or from the Approved Bank Account or the Lockbox Account, as applicable, so that the total amount debited by Purchaser from the Approved Bank Account or the Lockbox Account (as applicable) during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Merchant actually collected during the Reconciliation Month at issue.

III. **Request for Reconciliation Procedure.**

11. **Merchant's Right for Reconciliation of Weekly Deliveries.**

a. It shall be Merchant's sole responsibility and right hereunder to initiate Reconciliation of Merchant's actual Future Receipts during any Reconciliation Month by sending a request for reconciliation to Purchaser.
b. Any such request for Reconciliation of Merchant's Weekly receipts for a specific Reconciliation Month shall be in writing, shall include a copy of Merchant's bank statement(s) and credit card processing statement(s) for the Reconciliation Month at issue, and must be received by Purchaser via email atcustomer.service@libertasfunding.com within five (5) Business Days after the last day of the Reconciliation Month at issue (time being of the essence). Any request for Reconciliation received after this deadline will not be honored.
c. Merchant shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Purchaser shall comply with such request, provided that:
    i. Each such request is made in accordance with the terms of this Section 11.
    ii. If a request for Reconciliation is timely made after Purchaser has received the Completion Amount, and the Reconciliation results in part of the Completion Amount being refunded to Merchant, then Purchaser shall continue to receive weekly deliveries until it receives the Completion Amount.
    iii. If Purchaser becomes aware that it has received funds that it is not entitled to, then Purchaser shall return those funds to the Merchant without request by the Merchant for reconciliation as set forth above.
d. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving weekly deliveries whether or not Merchant has made a request for Reconciliation. Merchant agrees not to take any action to interfere with weekly deliveries based on the pendency of a request for Reconciliation.

12. **Adjustment of Weekly Delivery Amount.**

a. If a Reconciliation is performed that results in a refund to the Merchant of at least 20% of the aggregate Weekly Delivery Amounts received by Purchaser during the applicable Reconciliation Month, Merchant shall have the option to request, subject to the requirements of Section 13 below, modification ("Adjustment") of the Weekly Delivery Amount on a going-forward basis. Purchaser in its sole and absolute discretion may allow a temporary Adjustment upon Merchantâ€™s proof of circumstances warranting such Adjustment, such as a natural disaster requiring temporary closure of Merchantâ€™s business. After an Adjustment is granted, the adjusted Weekly Delivery Amount shall replace and supersede the amount of the Weekly Delivery Amount set forth in the preamble of this Agreement and future weekly deliveries shall be made in the adjusted amount. All Adjustments made in accordance with this section or other sections of this Agreement, shall be effective for one-month, after which time, the Merchant must provide Purchaser with its bank statements each month to allow Purchaser to re-evaluate the Merchantâ€™s information to determine whether a continued Adjustment is warranted.
b. The Adjustment of the Weekly Delivery Amount shall be performed by Purchaser within five (5) Business Days following its receipt of the Merchant's request for Adjustment.

13. **Request for Adjustment Procedure.**

a. It shall be Merchant's sole responsibility and right to initiate the Adjustment by sending a request for Adjustment to Purchaser.
b. A request for Adjustment (an "Adjustment Request") shall be in writing, shall include copies of: (i) Merchant's three (3) consecutive bank statements for the Approved Bank Account or Lockbox Account, as applicable, immediately preceding the date of Purchaser's receipt of the Adjustment Request; (ii) Merchant's three (3) consecutive payment card processing statements immediately preceding the date of Purchaser's receipt of the Adjustment Request; and/or (iii) Merchant's bank statements and payment card processing statements previously provided by Merchant to Purchaser when applying to sell Future Receipts to Purchaser, or when applying for the most recent Adjustment that was made, if applicable. The Adjustment Request shall be sent by email to Purchaser at customer.service@libertasfunding.com within five (5) Business Days after the date that is the later of the last day for which activity is shown on the latest bank statement enclosed with the Adjustment Request and the last day for which activity is shown on the latest card processing statement enclosed with the Adjustment Request (time being of the essence). Any Adjustment Request received after this deadline will not be honored.
c. Merchant may request Adjustment of the Weekly Delivery Amount as many times as it deems proper, and Purchaser shall comply with such Adjustment Requests, provided that:
    i. Each Adjustment Request is made in accordance with the requirements set forth in this Section 12;
    ii. No Adjustment Request may be made after Purchaser has received the Completion Amount; and
    iii. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving weeklydeliveries whether or not Merchant has made an Adjustment Request. Merchant agrees not to take any action to interfere with weekly deliveries based on the pendency of an Adjustment Request.

IV. **Payment Card Split Method Provisions.** The following terms (see Sections 14-16) apply if the Payment Cared Split Method is used, unless otherwise specified herein.

14. **Approved Card Processor.** Merchant agrees to enter into a payment card processing agreement with a payment card processor approved by Purchaser (the "Approved Card Processor") in order to obtain card processing services for credit cards, charge cards, debit cards, prepaid cards, or other payment cards used to purchase Merchant's goods and/or services. If Merchant has entered into a payment card processing agreement before the date of this Agreement, Merchant may request that Purchaser review such agreement and any other information it deems pertinent for approval of the existing payment card processor in the sole and absolute discretion of Purchaser. Merchant agrees to process all of its payment card transactions through the Approved Card Processor, and not to switch to a different payment card processor or use an additional payment card processor without Purchaser's express written consent. If Purchaser permits Merchant to use a different payment card processor, the n ew processor shall become the Approved Card Processor. In the event the Approved Card Processor becomes unavailable or Purchaser requests that a different payment card processor be used for any reason (such as the Approved Card Processor failing to timely deliver the Specified Percentage of Future Receipts to Purchaser on a consistent basis), Merchant shall arrange for another Approved Card Processor immediately, and in no event later than five calendar days after the Approved Card Processor becomes unavailable or Purchaser requests the designation of a new Approved Card Processor.

15. **Processing Arrangement.** Merchant hereby authorizes and directs the Approved Card Processor, and any other processor, acquirer, service provider, or financial institution taking custody of, holding, possessing, or issuing payment instructions with respect to Future Receipts (together, the "Receipts Custodians") to deliver the Specified Percentage of Future Receipts on each Business Day (the "Daily Amount") to Purchaser rather than Merchant until Purchaser has received the Completion Amount, or, in the event that Purchaser declares the entire Completion Amount to be deliverable based on a breach of this Agreement, to deliver this amount. On days when banks are not open, the Specified Percentage will be delivered to Purchaser on the next banking day. For example, the Specified Percentage for Friday, Saturday, and Sunday will be delivered on the following Monday (or Tuesday if Monday is a bank holiday). Merchant acknowledges that the Approved Card Processor will be acting on behalf of Purchaser to collect the Specified Percentage of Future Receipts. Merchant agrees that the Future Receipts sold under this Agreement are Purchaser's property. Purchaser shall have no obligation to refund or return the Amount Sold or any portion thereof to Merchant in the event that the Approved Card Processor or any other Receipts Custodian initiates a refund, credit, reversal, or chargeback of a transaction subject to this Agreement, as such adjustments typically are netted against future card volume. Merchant agrees that when a Receipts Custodian takes custody of, holds, possesses, or issues payment instructions with respect to Future Receipts, it does so in trust for Purchaser. If there has not been a default, a Receipts Custodian will not deliver any particular day's Daily Amount to us if that Daily Amount has already been delivered to us by another Receipts Custodian. **Merchant agrees that it does not have the right to revoke or otherwise seek to override the authorization and direction set forth in this section and that this authorization may only be revoked by Purchaser.** You agree that a Receipts Custodian may rely on any instructions issued by us with respect to the delivery of the Future Receipts, including an instruction to deliver all Future Receipts to us in the event we declare the Completion Amount to be deliverable based on a breach of this Agreement. You waive and release any and all claims you may have against any Receipts Custodian that are in any way related to the Receipts Custodian delivering Future Receipts to us as described in this section. You authorize each Receipts Custodian to provide us with any and all information we request about the Receivables that Receipts Custodian possesses or has access to, including without limitation information about daily volumes, number of transactions, distributions, chargebacks, offsets, withdrawals, and totals. **YOU, YOUR SUCCESSORS AND PERMITTED ASSIGNEES AND AFFILIATES, AGREE TO FOREVER DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS PURCHASER, EACH RECEIPTS CUSTODIAN, AND THEIR AND OUR SUCCESSORS, ASSIGNS, OFFICERS, DIRECTORS, MANAGERS, MEMBERS, AFFILIATES, AND REPRESENTATIVES AGAINST ALL DAMAGES, EXPENSES, CLAIMS, SUITS, DEMANDS, COSTS, ATTORNEYS' FEES OR LOSSES ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF OR IN CONNECTION WITH DELIVERING FUTURE RECEIPTS TO US AS DESCRIBED IN THIS SECTION. IN NO EVENT WILL WE OR THE RECEIPTS CUSTODIANS BE LIABLE TO YOU OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR FOR ANY DIRECT, CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**The Parties agree that any amounts due a Receipts Custodian under your agreement with such Receipts Custodian or otherwise take priority over amounts to be delivered to us under this Agreement. The Parties agree that each Receipts Custodian is a third-party beneficiary of this Agreement and may rely on this Agreement even though it is not a party to this Agreement. You grant to us an irrevocable power of attorney, coupled with an interest, and appoint us and our designees as your attorney-in-fact, to take any and all actions necessary or appropriate to direct any new or additional processor to make payment to us as contemplated by this Section.

a. **Processing Trial.** After this Agreement has been executed by Purchaser and Merchant, Purchaser has the option in its sole and absolute discretion to conduct a processing trial (the "Processing Trial") to determine whether the Specified Percentage will be correctly processed and/or reported by the Approved Card Processor to Purchaser. If Purchaser elects to conduct a Processing Trial, Merchant acknowledges and agrees that Purchaser will decide in its sole and absolute discretion whether to purchase the Amount Sold after completion of the Processing Trial. If Purchaser elects not to do so, any amounts received by Purchaser during the Processing Trial shall be refunded to the Merchant.

V. 16. **MERCHANT'S OBLIGATIONS, COVENANTS, REPRESENTATIONS AND WARRANTIES**Merchant agrees, covenants, represents, and warrants as follows at the time it executes this Agreement and on a continuing basis until such time as Purchaser has received the Completion Amount or Merchant has filed for bankruptcy or gone out of business in the ordinary course:

a. **Business Purpose; Use of Purchase Price. MERCHANT REPRESENTS AND WARRANTS THAT IT IS ENTERING INTO THIS AGREEMENT SOLELY FOR BUSINESS PURPOSES AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.** Merchant agrees to use the Purchase Price exclusively for the benefit and advancement of Merchant's business operations and for no other purpose.

b. **Financial Condition and Financial Information.** Merchant represents and warrants that its bank and financial statements, copies of which have been furnished to Purchaser, and future statements which may be furnished hereafter pursuant to this Agreement or upon Purchaser's request, fairly represent the financial condition of Merchant or other information set forth therein as of the dates such statements are issued, and prior to execution of the Agreement there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise Purchaser of any material adverse change in its financial condition, operation, or ownership. Purchaser may request statements at any time during the term of this Agreement and Merchant shall provide them to Purchaser within Five (5) Business Days. Merchant's failure to do so is a material breach of this Agreement.

c. **Read Only Access to the Approved Bank Account and Approved Card Account.** Merchant hereby agrees that, until Purchaser has received the Completion Amount, Purchaser shall have the right to perform ongoing read-only electronic monitoring of transactions occurring in the Approved Bank Account and Merchant's account with the Approved Card Processor (the "Approved Card Account"). Merchant agrees to provide Purchaser all required online access codes for the Approved Bank Account and the Approved Card Account. If Purchaser's

electronic (online) access to Merchant's Approved Bank Account or the Approved Card Account is disabled for any reason, Merchant shall immediately and diligently undertake all steps required of it to restore Purchaser's access to both accounts. Merchant's failure to comply with the provisions of this Section 16 shall constitute Merchant's material breach of its obligations under this Agreement.

d. **Governmental Approvals.** Merchant represents and warrants that it is in compliance and, until Purchaser receives the Completion Amount, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

e. **Good Standing.** Merchant represents and warrants that it is a corporation/limited liability company/limited partnership/other type of business entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

f. **Authorization.** Merchant represents and warrants that it has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Merchant is bound or any statute, rule, regulation, order, or other law to which Merchant is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Merchant. All organizational and other proceedings required to be taken by Merchant to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Merchant represents and warrants that he or she has full power and authority to bind Merchant to perform its obligations under this Agreement.

g. **Accounting Records and Tax Returns.** Merchant shall treat receipt of the Purchase Price and delivery of the Specified Percentage of Future Receipts in a manner consistent with its nature as a true sale of Future Receipts in its accounting records and tax returns and further agrees that Purchaser is entitled to audit Merchant's accounting records upon reasonable Notice in order to verify compliance. Merchant hereby waives any rights of privacy, confidentiality, or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Merchant asserts that this transaction is anything other than a sale of future receipts.

h. **Taxes; Workers Compensation Insurance.** Merchant will promptly pay, when due, all taxes, including, without limitation, income, employment, sales and use taxes, imposed upon Merchant's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

i. **Business Insurance.** Merchant will maintain general liability and business-interruption insurance in the amounts and against risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

j. **No Change of Business.** You will not materially change the goods or services you sell, materially change the nature of your business, change the business entity through which you carry on your business, change any of the locations where you operate your business, or change the name under which you do business without first notifying us and obtaining our prior written consent.

k. **No Closing of Business.** Merchant represents and warrants that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Merchant agrees that, until Purchaser receives the Completion Amount, Merchant will not voluntarily close its business on a permanent or temporary basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Merchant shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Merchant's business by legal authorities having jurisdiction over Merchant's business (such as from a health department or fire department) or if such closing is necessitated by circumstances outside Merchant's reasonable control. Prior to any such temporary closure of its business, Merchant shall provide Purchaser ten (10) Business Days' advance notice, or as much notice as reasonably possible under the circumstances.

l. **No Pending Bankruptcy.** As of the date of Merchant's execution of this Agreement, Merchant is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code, and there has been no involuntary bankruptcy petition brought or threatened against Merchant. Merchant represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy within the six-month period immediately preceding the date of this Agreement. A breach of any of these representations shall be a material breach of this Agreement. If you go out of business or become the subject of a voluntary or involuntary bankruptcy filing within forty-five (45) days of our purchasing the Amount Sold, you agree that there will be a rebuttable presumption of a material breach.

m. **Estoppel Certificate.** Each time that we request, you will, upon at least one (1) day's prior notice from us, execute, acknowledge and deliver to us and/or to any other person, person firm or corporation specified by us, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which all or any portion of the Amount Sold has been delivered.

n. **Unencumbered Future Receipts.** Merchant has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Merchant shall not sell Future Receipts or obtain any additional financing before Purchaser has received the Completion Amount without Purchaser's express written consent. Merchant shall not take any action inconsistent with or in derogation of Purchaser's ownership of the Amount Sold.

o. **No Default Under Contracts with Third Parties.** Merchant's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Merchant under any contract which Merchant is or may become a party to, or otherwise violate any of Merchant's obligations to third parties.

p. **Right of Access.** In order to ensure Merchant's compliance with the terms of this Agreement, Merchant hereby grants Purchaser the right to enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's Future Receipts to its Approved Card Processor and to ensure that Merchant has not violated any other provision of this Agreement. Furthermore, Merchant hereby grants Purchaser and its employees and consultants' access to Merchant's employees and records and all other items of property located at the Merchant's place of business during the term of this Agreement. Merchant hereby agrees to provide Purchaser, upon request, all and any information concerning Merchant's business operations, banking relationships, names and contact information of Merchant's suppliers, vendors and landlord(s), to allow Purchaser to interview any of those parties regarding any matters relevant to this Agreement.

q. **Phone Recordings and Contact.** Merchant agrees that any call between Merchant and Purchaser and its owners, managers, employees and agents may be recorded and/or monitored.

r. **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf of Merchant with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Merchant entering into this Agreement.

s. **Merchant's Due Diligence.** The person authorized to sign this Agreement on behalf of Merchant: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had

unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Purchaser.

t. **Arm's-Length Transaction.** The person signing this Agreement of behalf of Merchant: (a) has read and fully understands content of this Agreement; (b) has consulted to the extent he/she wished with Merchant's own counsel in connection with the entering into this Agreement; (c) he or she has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Merchant, and whether this Agreement adequately reflects his or her understanding of its terms.

u. **Integration; No Reliance on Oral Representations.** This Agreement contains the entire agreement between Merchant and Purchaser with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect the parties' obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

## VI. PLEDGE OF SECURITY:

17. **Acknowledgment of Security Interest and Security Agreement.** The Future Receipts sold by Merchant to Purchaser pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code in effect in the state in which Merchant is located (the "UCC"). Such Sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Merchant to Purchaser. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the Future Receipts creates a security interest as defined in the UCC; (ii) this Agreement constitutes a "security agreement" under the UCC; and (iii) Purchaser has all the rights of a secured party under the UCC with respect to such Future Receipts. Merchant further agrees that, with or without an Event of Default, Purchaser may notify account debtors, or other persons obligated on the Future Receipts, on holding the Future Receipts of Merchant's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Purchaser.

18. **Financing Statements.** Merchant authorizes Purchaser to file one or more UCC-1 forms consistent with the UCC to give notice that the Amount Sold is the sole property of Purchaser. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that Merchant is prohibited from obtaining any financing that impairs the value of the Amount Sold or Purchaser's ability to collect same. Merchant authorizes Purchaser to debit the Approved Bank Account or Lockbox Account, as applicable, for all costs incurred by Purchaser associated with the filing, amendment or termination of any UCC filings.

19. **Security.** You understand that we have the right to take delivery of the Future Receipts we purchased as they are generated in the ordinary course of your business. The Security Interest granted in this section is being given solely for the purpose of ensuring that you do not take any action to deprive us of that right. This Security Interest does not mean that we have made a loan to you, does not create a debt, and does not make you a debtor or us a creditor. As security for the prompt and complete performance of any and all obligations, covenants, and agreements of Merchant under this Agreement, now or hereafter arising from, out of, or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations"), Merchant hereby pledges, assigns and hypothecates to Purchaser and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Merchant's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the UCC, now or hereafter owned or acquired by Merchant; and
b. all Merchant's proceeds, as that term is defined by Article 9 of the UCC.

20. **Termination of Pledge.** Upon the performance by Merchant in full of the Merchant Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Merchant. Upon any such termination, Purchaser will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Merchant shall reasonably request.

21. **Representations with Respect to Collateral.** Merchant hereby represents and warrants to Purchaser that: the execution, delivery and performance by Merchant of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Merchant is a party or by which any of Merchant's assets (including, without limitation, the Collateral) are bound.

22. **Further Assurances.** Upon the request of Purchaser, Merchant at its sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral, and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

23. **Attorney-in-fact.** Merchant hereby authorizes Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Merchant and in the name of Merchant or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Merchant, and thereafter filing any such financing and/or continuation statements and (b) to receive, endorse and collect all instruments made payable to Merchant.

## VII. EVENTS OF DEFAULT AND REMEDIES:

24. **Events of Default by Merchant.** The occurrence of any of the following events shall constitute an "Event of Default" by Merchant:

a. **Events of Default.**
b. **Bad Acts.** If you commit any of the following acts ("Bad Acts") without our prior written consent before we receive the Completion Amount, you will be in default:
    i. you sell, transfer or otherwise encumber or attempt to sell, transfer or otherwise encumber Future Receipts, whether or not such Future Receipts are part of the Amount Soldâ€"sometimes referred to as "stacking" our Purchase Price with other funding companies;
    ii. you encumber or allow any encumbrance to attach to our interest in the Amount Sold;
    iii. you sell all or substantially all of your assets used in the operation of your business to a third party;
    iv. you materially change the operation of your business (e.g., changes in industry, concept, size, etc.);
    v. you stop accepting a particular method of payment while you remain open for business;
    vi. you change your legal name or jurisdiction of formation, or carry-on business through a different business entity;
    vii. you change, close, or terminate the Approved Bank Account or Approved Card Processor, or interfere with the lockbox arrangement, without our express written consent;
    viii. you do not obtain a replacement Approved Bank Account or Approved Card Processor acceptable to us within fifteen (15) days after your bank or processor terminates its relationship with you;
    ix. you process any card transaction through a payment card processor other than the Approved Card Processor;
    x. you provide us with false or misleading information about your business or revenue (in your application or otherwise) that is material to our decision to purchase Future Receipts from you;
    xi. you deposit or cause to be deposited by others Future Receipts into any account other than the Approved Bank Account or Lockbox Account, if applicable;
    xii. you take or fail to take an action that hinders our taking delivery of our Specified Percentage of Future Receipts from the Approved Bank Account, Lockbox Account, or any Receivables Custodian, as applicable;
    xiii. you disconnect or interfere with the operation of Purchaser's bank monitoring software; or
    xiv. you commit any act or omission specified in this Agreement to be a material breach. However, we will not consider any of these acts to be Bad Acts if they occur because you go out of business in the ordinary course. These Bad Acts are prohibited solely to protect our ability to collect the Amount Sold and receive the benefit of our bargain. They do not create any obligation for Merchant to deliver Future Receipts to Purchaser if they are simply not generated by Merchant's business.
c. Other Breaches. If you commit an act that is not a Bad Act but that otherwise violates a term or covenant in this Agreement (an "Other Breach"), you will be in default.

25. **Remedies.** If you commit a Bad Act, you will be liable to us in an amount in cash equal to (a) the undelivered portion of the Amount Sold, plus (b) any other fees and other amounts due to us under this Agreement, plus (c) any additional amounts you would owe us for committing an Other Breach. If you commit an Other Breach, you will be liable to us for all damages resulting from the Other Breach, including, but not limited to, our reasonable attorneys' fees, expenses and costs incurred in any proceeding pursued against you to recover the amounts due us under this Agreement. You agree to pay us the amounts due or we may (d) withdraw such amounts from the Approved Bank Account or Lockbox Account, as applicable, or any other account into which you deposit Future Receipts, via ACH or electronic checks; (e) direct the Approved Card Processor, any other Receipts Custodian, and/or any other payment card processor you use in violation of this Agreement to deliver all of your Future Receipts to us until we have received the amount due; (f) enforce our rights as a secured creditor under the UCC including, without limitation, notifying any of your account debtor(s) of our security interest; (g) enforce Guarantor's personal guaranty of performance provisions of this Agreement against the Guarantor(s) without first seeking recourse from Merchant; (h) commence a suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merch ant's and Guarantor's obligations hereunder or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC. All rights available to us are cumulative and not exclusive of any other remedies available to us in law or equity.

26. **Power of Attorney.** Each Merchant and Guarantor irrevocably appoints Purchaser and its representatives as their respective agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to Purchaser from any payment card processor and/or account debtor(s) of Merchant; (B) upon occurrence of a Bad Act, to perform any and all such obligations of Merchant under this Agreement, including without limitation (i) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) above; (iii) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; and (iv) to file any claims or take any action or institute any proceeding against Merchant and/or Guarantor which Purchaser may deem necessary for the collection of any portion of the undelivered Amount Sold from the Collateral, or otherwise to enforce its rights under this Agreement.

VIII. **ADDITIONAL TERMS:**

27. **Fees.** In addition to all other sums due to Purchaser under this Agreement, Merchant shall pay to Purchaser:

a. An Origination Fee of $30,000.00 upon entering into this Agreement as reimbursement of Purchaser's costs associated with entering into this Agreement (the cost of due diligence on the Merchant's business, financial and legal due diligence, etc.)
b. A Non-Sufficient Funds ("NSF") fee of $35 in each and every instance when delivery of the Weekly Delivery Amount to Purchaser has failed due to insufficient funds in the Merchant's Approved Bank Account or Lockbox Account, as applicable; provided, however, that no NSF fee shall be due when the delivery failed because Merchant's business did not generate sufficient Future Receipts to cover the Weekly Delivery Amount and Merchant promptly requested Reconciliation and/or Adjustment.
c. $100 in each and every instance when Merchant blocks Purchaser's access (or otherwise prevents Purchaser from accessing) Merchant's bank accounts.
d. $2,500 in each and every instance when, upon occurrence of an Event of Default, Purchaser shall have agreed to waive Merchant's default.

28. **Financial Condition.** Merchant and its Guarantor(s) authorize Purchaser and its agents to investigate their financial responsibility and history and will provide to Purchaser any bank or financial statements, tax returns, etc., as deems necessary prior to or at any time after execution of this Agreement. A photocopy or electronic image of this authorization will be deemed as acceptable for release of financial information. Purchaser is authorized to update such information and financial profiles from t ime to time as it deems appropriate.

29. **Transactional History.** Merchant shall execute written authorization(s) to their bank(s) to provide Purchaser with Merchant's banking and/or credit-card processing history.

30. **No Liability.** In no event shall Purchaser be liable for any claims asserted by Merchant or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

31. **Right to Cancel.**

i. Notwithstanding anything to the contrary set forth in this Agreement, Purchaser shall have the right to cancel this agreement any time prior to its delivery of the Purchase Price to Merchant and, upon such cancellation, this Agreement shall become null, and void and the parties shall have no obligation to, or rights against, each other, except that all sums delivered by Merchant to Purchaser on account of entering into this Agreement shall be promptly returned to Merchant.
ii. Notwithstanding anything to the contrary set forth in this Agreement, in the event Merchant has not been in default under this Agreement, Merchant shall have the right to cancel this Agreement any time until the midnight of the second (2nd) Business Day following the date of its receipt of the Purchase Price by notifying Purchaser of such cancellation by notice sent in accordance with this Agreement. Upon timely delivering such cancellation notice to Purchaser, and further provided that Merchant has otherwise complied with the provisions of this Agreement, Merchant shall refund the entire amount of the Purchase Price back to Purchaser within five (5) Business Days following the date of Merchant's receipt of the Purchase Price. Upon such refund of the Purchase Price back to Purchaser, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that Purchaser shall have the right keep, as fair and adequate compensation for its costs of entering into this Agreement with Merchant, the origination fee and all Weekly Delivery Amounts received by Purchaser prior to the date when this Agreement is terminated.

IX. **GUARANTY OF PERFORMANCE OF MERCHANT'S OBLIGATIONS:**

32. **Guarantor's Representations.** Guarantor represents and warrants to Purchaser that:

a. Guarantor is an owner, officer, or manager of Merchant and will directly benefit from Purchaser and Merchant entering into the Agreement.
b. Guarantor understands and acknowledges that Purchaser is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Merchant under this Agreement, now or hereafter arising from, out of or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations").

33. **Guaranty of Merchant's Obligations.** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful, and complete performance and observance of all Merchant Obligations; and Guarantor unconditionally covenants to Purchaser that if Merchant shall at any time breach any of the Merchant Obligations, Guarantor shall perform (or cause to be performed) the Merchant Obligations and pay all damages and other amounts stipulated in this Agreement with respect to the non-performance of the Merchant Obligations, or any of them.

34. **Guarantor's Other Agreements.** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Merchant to dispose, convey, sell or otherwise transfer, any material business assets of Merchant without the prior written consent of Purchaser, which consent may be withheld for any reason, until Purchaser has received the Completion Amount. Guarantor shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred as the result of, or incidental to, or relating to, the enforcement or protection of Purchaser's rights against Merchant and Guarantor under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors an assign of Purchaser. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Merchant and Purchaser, or the existence of any defense, setoff or counterclaim, which Merchant may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Merchant's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

35. **Two Or More Guarantors.** If there is more than one Guarantor, "Guarantor" in this Agreement shall mean all Guarantors and the obligations of the Guarantors hereunder shall be joint and several.

36. **Waiver; Remedies.** No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Merchant fails to perform any obligation under the Agreement, Purchaser may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Merchant or any other guarantor.

37. **Acknowledgment of Purchase.** Guarantor acknowledges and agrees that the Purchase Price paid by Purchaser to Merchant in exchange for the Amount Sold is adequate consideration for the purchase of the Amount Sold and is not a loan or financial accommodation from Purchaser to Merchant. Guarantor specifically acknowledges Purchaser is not a lender, bank, or credit card processor, and that Purchaser has not offered any loans to Merchant. Guarantor waives any claims or defenses of usury in any action arising out of this Agreement.

38. **Severability.** If for any reason any court of competent jurisdiction finds any provisions of this Agreement applicable to the Guarantor to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in those provisions shall be effective to the fullest extent allowed under applicable law.

39. **Opportunity for Attorney Review.** Guarantor represents that he/she has carefully read this Agreement and has, or had an opportunity to, consult with his or her attorney. Guarantor understands the contents of this Agreement, signs it as his or her free act and deed and agrees to be bound by the provisions hereof.

X. **MISCELLANEOUS:**

40. **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

41. **Assignment.** Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Merchant or the Guarantor. Neither Merchant nor Guarantor shall have the right to assign their respective rights or obligations under this Agreement without first obtaining Purchaser's written consent.

42. **Notices.** All notices, requests, consent, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement and shall become effective as of the date of receipt or declined receipt.

43. **Waiver Remedies.** No failure on the part of any party to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

44. **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

45. **Governing Law, Venue and Jurisdiction.** This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State (the "Acceptable Forums"). Each party signing this Agreement agrees that the Acceptable Forums are convenient, and irrevocably submits to the jurisdiction of the Acceptable Forums and waives any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

46. **Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been complied with and satisfied in full and this Agreement shall have terminated.

47. **Severability.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

48. **Waiver of Class Action; Waiver of Jury Trial.** By entering into this agreement, the parties agree that they may bring claims against the other only in their individual capacity, and**THE PARTIES ARE EACH EXPRESSLY WAIVING ANY AND ALL RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER IN ANY CLASS ACTION, PUTATIVE OR PURPORTED CLASS ACTION, REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR SIMILAR ACTION RELATING TO ANY CLAIMS (AS HEREINAFTER DEFINED), WHETHER BROUGHT UNDER STATE OR FEDERAL LAW.** The parties are each expressly waiving any and all right to join or consolidate claims in any proceeding with those of any other person (except any obligors and guarantors of the same agreement). Further, **BY ENTERING INTO THIS AGREEMENT, THE PARTIES ARE EACH EXPRESSLY WAIVING THEIR RESPECTIVE RIGHTS TO A JURY TRIAL FOR ALL CLAIMS.** The term "Claim" means any claim, dispute, or controversy (whether based on contract, tort, statute, or otherwise, and whether seeking monetary or any form of non-monetary relief) arising out of or relating to this Agreement or the relationship between or among the parties (collectively, "Claims"). The term Claims is to be given its broadest possible meaning, and includes pre-existing, present, and future Claims, and Claims regarding the enforceability or scope of this waiver. For purposes of this waiver only, the term "party" means that party and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, agents, vendors, employees, officers, and directors. **THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

49. **Captions.** The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

50. **Counterparts and Facsimile Signatures.** This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when take together shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

**The balance of this page left intentionally blank**

**MERCHANT NAME: ACM DEVELOPMENT, LLC, et al.**
(legal name of the business)

By: Eric Mynhier
Eric Mynhier (Aug 30, 2021 17:27 EDT)

Name: ERIC RAY MYNHIER
Title: Owner
FEIN: 263582332

**OWNER/GUARANTOR #1:**

Eric Mynhier
Eric Mynhier (Aug 30, 2021 17:27 EDT)

Name: ERIC RAY MYNHIER
SSN: 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

**Libertas Funding LLC**

By: ______________________________

Name: Randy Saluck
Title: CEO, Libertas Funding LLC

## Libertas Electronic Fund Transfer Authorization

This Libertas Electronic Fund Transfer Authorization (the "Authorization") supplements the foregoing concurrent Agreement of Sale of Future Receipts (the "Agreement"). Except as noted below, capitalized terms in this Authorization have the meaning set forth in the Agreement.

You irrevocably authorize us (which includes for the purposes of this authorization, our agents, service providers, successors, and assigns) to take delivery of each Weekly Delivery Amount by initiating an electronic fund transfer via the Automated Clearing House network or similar network (an "ACH") from the business deposit account specified below, any substitute account you later specify, or any other account containing your Future Receipts (collectively, the "Account") on or after the date the associated Future Receipts were created. You authorize us to initiate a single ACH for the combined amounts of different Weekly Delivery Amounts as permitted by the Agreement. You further authorize us initiate ACHs to the Account for any amounts that come due under the Agreement, including ACHs for the Completion Amount in the event you commit a Bad Act. You also authorize us to initiate ACH credits or debits to the Account to correct any errors we may make in processing a payment. In the event that an ACH is returned unpaid, you authorize us to reinitiate the ACH until it is paid and to initiate a separate ACH or to add to a reinitiated ACH the amount of any dishonored payment fee that we charge. You agree that you will not cancel this Authorization or instruct any depository holding Future Receipts we purchased to reject our ACHs. You promise that the Account specified below and any substitute Account you provide us is used for business purposes and not for personal, family or household purposes and that you are an authorized signor on these Accounts.

Business Deposit Account Information:

**Account Number:** 4002003756 **Routing Number:** 063114661
**Depository Name:** Cogent Bank **Depository City/State:** Orlando, FL. 32801

**Type of Account**

☑ **Business Checking** ☐ **Business Savings**
☐ **Other Business Acct. (specify):** ____________

By signing below, you agree to the terms of this Libertas Electronic Fund Transfer Authorization.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding LLC**

By: ____________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ACM DEVELOPMENT, LLC, et al.**

By: X Eric Mynhier

Name: ERIC RAY MYNHIER

Title: Owner

By: X Eric Mynhier

Owner: ERIC RAY MYNHIER

# ADDENDUM TO CONTRACT

## Addendum to Merchant Agreement 288304

This is an addendum ("Addendum") to that certain merchant agreement (the "Merchant Agreement") entered into by and among Libertas Funding LLC (the "Purchaser"), ERIC RAY MYNHIER (the "Owner") and ACM DEVELOPMENT, LLC (the "Seller") dated as of August 30, 2021.

WHEREAS, the Purchaser, the Owner and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. The Owner and the Seller are hereafter referred to collectively as the Merchant (the "Merchant").
B. Except as provided below, it is understood and agreed that the Merchant may repurchase Future Receipts sold to the Purchaser but not yet delivered to end this financing transaction.. The Repurchase Price for such early repurchase shall be set forth below, less the amount of any Weekly Deliveries made prior to the date of Repurchase, plus any unpaid fees or charges. Month 1 begins on the Commencement Date. August 30, 2021.
C. Except as provided in this addendum, all terms and conditions of the Merchant Agreement and the Supplement shall remain in full force and effect.
D. This addendum shall be bound by the laws of the state of New York.

**Note that the Repurchase Price for each month below is equal to the undelivered portion of the Amount Sold divided by the Discount Factor as set forth in the "Key Business Terms and Definitions" on page 2 in the "Repurchase Price" box.**

| Repurchase Month | Repurchase Price (the amount below LESS Weekly Deliveries collected by Purchaser) |
|---|---|
| 1 | $1,710,000.00 |
| 2 | $1,755,000.00 |
| 3 | $1,785,000.00 |
| 4 | $1,830,000.00 |
| 5 | $1,860,000.00 |

All other terms of the referenced Merchant Agreement remain unchanged.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding LLC**

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ACM DEVELOPMENT, LLC, et al.**

By: X Eric Mynhier
Eric Mynhier (Aug 30, 2021 17:27 EDT)

Name: ERIC RAY MYNHIER

Title: Owner

By: X Eric Mynhier
Eric Mynhier (Aug 30, 2021 17:27 EDT)

Owner: ERIC RAY MYNHIER

LIBERTAS

**Seller Definition Addendum to the Agreement of Sale of Future Receipts Dated:**

**August 30th, 2021**

Purchaser and Guarantor(s) hereby agree that "Merchant" is defined as follows:

**Name:** ACM DEVELOPMENT, LLC
**Address:** 562 BOWNESS AVE OCOEE, FL 34761
**FEIN:** 263582332

**Name:** LUCID TECH LLC
**Address:** 938 TILDEN OAKS TRAIL WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** EMPIRICAL RETAIL LLC
**Address:** 849 OAKLAND PARK BLVD WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** EUPHORIA RETAIL LLC
**Address:** 938 TILDEN OAKS TRAIL WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** NINETEEN SEVENTY FOUR LLC
**Address:** 938 TILDEN OAKS TRAIL WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** OMEGA ENTERPRISES LLC
**Address:** 938 TILDEN OAKS TRAIL WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** IRONSHIELD PAVING LLC
**Address:** 938 TILDEN OAKS TRAIL WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** RAD RETAIL LLC
**Address:** 938 TILDEN OAKS TRAIL WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** SUN FL ENTERPRISES LLC
**Address:** 849 OAKLAND PARK BLVD WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** LOLYPALOOZA ENTERPRISES LLC
**Address:** 938 TILDEN OAKS TRAIL WINTER GARDEN, FL 34787
**FEIN:** 0

**Name:** KINGDOM PROPERTY INVESTMENTS LLC
**Address:** 562 BOWNESS AVE OCOEE, FL 34761
**FEIN:** 0

**Name:** VORTEX RETAIL LLC
**Address:** 938 TILDEN OAKS TRAIL WINTER GARDEN, FL 34787
**FEIN:** 0

**ACM DEVELOPMENT, LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**LUCID TECH LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**EMPIRICAL RETAIL LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**EUPHORIA RETAIL LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**NINETEEN SEVENTY FOUR LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**OMEGA ENTERPRISES LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**IRONSHIELD PAVING LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**RAD RETAIL LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**SUN FL ENTERPRISES LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**LOLYPALOOZA ENTERPRISES LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**KINGDOM PROPERTY INVESTMENTS LLC**

Agreed to by: *Eric Mynhier* Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**VORTEX RETAIL LLC**

Agreed to by: Eric Mynhier
Eric Mynhier (Aug 30, 2021 17:27 EDT) (Signature), their Owner (Title)

Print Owner's Name Eric Mynhier

**Purchaser: Libertas Funding LLC**

Agreed to by: ______________________ (Signature), its ______________________ (Title)

# ADDENDUM TO CONTRACT

## Addendum to Merchant Agreement 288304

**Purchase Price: $1,500,000.00 Purchased Percentage: 20% Purchased Amount: $2,040,000.00**

This is an addendum ("Addendum") to that certain merchant agreement 288304 (the "Merchant Agreement") entered into by and among Libertas Funding LLC (the "Purchaser"), ERIC RAY MYNHIER (the "Owner") and ACM DEVELOPMENT, LLC (the "Seller" or "Merchant") dated as of August 30, 2021

WHEREAS, the Purchaser and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. Except as provided in this Addendum, all terms and conditions of the Merchant Agreement shall remain in full force and effect. All capitalized terms not defined in this Addendum shall have the meaning set forth in the Merchant Agreement.
B. Merchant acknowledges, accepts, and agrees that as long as the Seller has not delivered all of the WeeklyDeliveries in connection with the Merchant Agreement, the Merchant understands that taking an additional short-term (12 months or less in expected term) cash advance based on credit card receivables or an ACH-based cash advance or loan based on total sales or deposits with any company (other than the Purchaser or the Purchaser's wholly-owned subsidiaries) would constitute an event of default under the Merchant Agreement, unless the Merchant receives a written authorization from the Purchaser prior to it taking such additional financing.
C. Merchant acknowledges, accepts, and agrees that a breach of this addendum (particularly section B above) will constitute a breach/event of default of the Merchant Agreement and that doing so will result in either (i) the immediate acceleration of all Weekly Deliveries.
D. This Addendum shall be governed by the laws of the State of New York.
E. This Addendum may only be modified in writing by Purchaser and Merchant.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding LLC**

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ACM DEVELOPMENT, LLC, et al.**

By: X Eric Mynhier
Eric Mynhier (Aug 30, 2021 17:27 EDT)

Name: ERIC RAY MYNHIER

Title: Owner

By: X Eric Mynhier
Eric Mynhier (Aug 30, 2021 17:27 EDT)

Owner: ERIC RAY MYNHIER

# ACM_DEVELOPMENT_LLC-CONTRACT

Final Audit Report 2021-08-30

| | |
|---|---|
| Created: | 2021-08-30 |
| By: | stips group (stips@libertasfunding.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAa8Vfp2jg5uCslp32M3MQDfLM28pfJCCc |

## "ACM_DEVELOPMENT_LLC-CONTRACT" History

Document created by stips group (stips@libertasfunding.com)
2021-08-30 - 8:57:47 PM GMT- IP address: 160.72.124.38

Document emailed to Eric Mynhier (eric@acmdev.net) for signature
2021-08-30 - 9:03:26 PM GMT

Email viewed by Eric Mynhier (eric@acmdev.net)
2021-08-30 - 9:09:20 PM GMT- IP address: 68.204.70.217

Document e-signed by Eric Mynhier (eric@acmdev.net)
Signature Date: 2021-08-30 - 9:27:40 PM GMT - Time Source: server- IP address: 68.204.70.217

Agreement completed.
2021-08-30 - 9:27:40 PM GMT

# EXHIBIT "B"

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| YOUR LOAN DETAILS | |
|---|---|
| **Borrower/Business Legal Name:** | ACM Development, LLC |
| **D/B/A** | ACM Development LLC |
| **Federal Tax ID#** | 26-3582332 |
| **Physical Address (Business Location)** | 562 Bowness Ave, Ocoee, FL 34761, USA |
| **Mailing Address (If different from Physical Location)** | |
| **Lender:** | WebBank |
| **Loan Amount:** | $ 750,000.00 |
| **Factor Rate:** | 1.32 |
| **Term:** | 15 Months |
| **WEEKLY Payment Amount :** | $ 15,230.77 |
| **Origination Fee:**<br>**(Deducted at time of disbursement)** | $ 15,000.00 |
| **Prepayment:** | **The above stated Factor Rate will be reduced, as set forth below, if the Loan is paid off prior to the end of the scheduled term. The discounted Factor Rate will be as follows:**<br><br>**Loan paid off within one (1) month of disbursement/funding: = 1.12**<br><br>**Loan paid off within two (2) months of disbursement/funding: = 1.14**<br><br>**Loan paid off within three (3) months of disbursement/funding: = 1.16**<br><br>**Loan paid off within four (4) months of disbursement/funding: = 1.18**<br><br>**Loan paid off within five (5) months of disbursement/funding: = 1.20**<br><br>**Loan paid off within six (6) months of disbursement/funding: = 1.22** |
| **Application ID:** | APP-0000001403 |

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

*This tool is provided to help you understand and assess the cost of your business financing. The calculations below involve certain key assumptions about this Loan, including that the Loan is paid off in its entirety according to the agreed payment schedule and that no repayments are missed or late.*

| Loan Amount | Disbursement Amount[1] | Repayment Amount[2] | Term |
|---|---|---|---|
| **$ 750,000.00** | **$ 735,000.00** | **$ 990,000.00** | **15 Months** (repaid WEEKLY ) |

| METRIC | METRIC CALCULATION | | METRIC EXPLANATION |
|---|---|---|---|
| **Total Cost-of-Funds** | Origination Fee: | **$ 15,000.00** | The Origination Fee is deducted from the Loan Amount at the time of disbursement. |
| | Cost-of-Funds | **$ 240,000.00** | Cost-of-Funds is the Loan Amount multiplied by the Factor Rate minus the Loan Amount. |
| | **Total Cost-of-Funds:** | **$ 255,000.00** | This is the total amount that you will pay for the Loan. The Total Cost-of-Funds amount does not include fees and other charges you can avoid, such as Returned Payment Fees, Bank Block Fees and Default Waiver Fees.[2] |
| **Factor Rate** | **1.32** | | This is the rate that determines the Cost-of-Funds. |
| **Average Monthly Payment (WEEKLY)** | Repayment Amount: | **$ 990,000.00** | This is the average monthly repayment amount of the Loan, which does not include fees and other charges you can avoid, such as Returned Payment Fees, Bank Block Fees and Default Waiver Fees.[2] |
| | Term (in months): | **15 Months** | |
| | Average (WEEKLY) Payment: | **$ 15,230.77** | The actual repayment frequency for the Loan will be WEEKLY. This is an estimate for comparison purposes only. |
| **Cents on the Dollar (*excluding fees*)** | Cost-of Funds: | **$ 240,000.00** | |
| | Loan Amount: | **$ 750,000.00** | |
| | Cents on the Dollar (***excluding fees***): | **0.32 ¢** | This is the Cost-of-Funds paid per dollar borrowed. This amount is exclusive of fees. |
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges? | | **No** |
| | Does the prepayment of this Loan decrease the Repayment Amount? | | **Yes** (See Prepayment Section above and Section 20 of the accompanying Business Loan and Security Agreement for specific details regarding prepayment). |

[1] The Disbursement Amount is the Loan Amount less the Origination Fee. Note that the Disbursement Amount may not be the amount deposited to your Designated Checking Bank Account. The amount that will be deposited to your Designated Checking Account will be reduced by any amounts owed to Lender from a prior loan or used to pay off an amount owed to a third-party.

[2] Your business may incur other fees that are not a condition of borrowing, such as Returned Payment Fees, Bank Block Fees or Default Waiver Fees. Those fees are not reflected above. See Section 20 of the accompanying Business Loan and Security Agreement for details on these fees.

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| FEES | |
|---|---|
| **Mandatory Fees:**<br>**Origination Fee:** | **$ 15,000.00** |
| **Other Potential Fees:**<br>**Returned Payment Fee:** | $ 35.00 per instance. |
| **Bank Block Fee:** | $ 100.00 per instance. |
| **Default Waiver Fee:** | $ 2,500.00 per instance. |
| | See Section 20 of the accompanying Business Loan and Security Agreement for more details regarding these Fees. |

| CERTAIN DISCLOSURES | |
|---|---|
| **USA Patriot Act Notice.**<br><br>**Important Information About Procedures For Opening A New Account** | To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.<br><br>What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. |
| **Loan Pricing Disclosure** | Lender uses a system of risk-based pricing to determine the Cost-of-funds. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the Cost-of-Funds rate up or down based on this risk evaluation. Although Lender believes that its loan process provides expedited turnaround time and efficient access to capital, this loan may be a higher cost loan than loans that may be available through other lenders. |
| **Loan for Specific Purposes Only** | The proceeds of the requested Loan may solely be used for business purposes as set forth in the accompanying Business Loan and Security Agreement. **IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR FOR ILLEGAL PURPOSES.** Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law **will not apply** to this transaction. |

# BUSINESS LOAN AND SECURITY AGREEMENT

**1. INTRODUCTION.** This Business Loan and Security Agreement together with the accompanying Business Loan and Security Agreement Supplement and the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), (collectively this "Agreement") governs your business loan ("Loan") made by WebBank. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" mean the Borrower identified on the signature page of this Business Loan and Security Agreement. Each Guarantor identified on the signature page of this Business Loan and Security Agreement shall be referred to as "Guarantor" or "Guarantors" in this Agreement. The words "Lender", "we", "us", and "our" mean WebBank or its successor(s) and assign(s).

**2. EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in Utah. We may accept this Agreement without signing it by sending you the Disbursement Amount. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of the Disbursement Amount to Borrower until in Lender's sole discretion all required security interests have been perfected and Lender has received all required personal guarantees or other documentation. If there is a delay in your receipt of the Disbursement Amount, you agree that there will be no adverse consequence to you or us.

**3. AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

**4. LOAN FOR BUSINESS PURPOSES ONLY. The proceeds of the requested Loan may solely be used for business purposes and not for any other purposes. In addition, the Loan will not be used for personal, family or household purposes or illegal purposes, and Borrower and Guarantors are forever estopped from taking the position that such Loan (including Advances, if any) are or were used for such personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for personal, family or household purposes, and certain important rights conferred upon such persons, pursuant to federal or state law will not apply to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section. Borrower and Guarantors agree that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's and Guarantor's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for personal, family or household purposes.**

**5. DISBURSEMENT OF LOAN PROCEEDS, MAINTENANCE OF BORROWER'S BANK ACCOUNT, AND RIGHT TO CANCEL.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower agrees to maintain sufficient funds to meet its Obligations (defined below) under the Agreement (including keeping such account open until the Total Repayment Amount has been completely repaid) in the account identified in the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), which is the account that was reviewed in conjunction with underwriting and approval of this Loan.

**Right to Cancel.** Notwithstanding anything to the contrary set forth in this Agreement, the Borrower shall have the right to cancel this Agreement any time until the midnight of the second Business Day following the date Disbursement Amount is initiated by Lender by notifying the Lender or the Servicer of such cancellation by notice sent in accordance with section 38 of this Agreement. Upon timely delivering such cancellation notice to Lender or Servicer, and further provided that Borrower has otherwise complied with the provisions of this Agreement, Borrower shall refund the entire amount of the Disbursement Amount back to the Lender within three (3) Business Days following the date disbursement of the Disbursement Amount is initiated by Lender. Upon such refund of the Disbursement Amount back to Lender, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that the Lender shall have the right to keep, as fair and adequate compensation for its costs of entering into this Agreement with Borrower, the entire amount of Weekly Payment Amount or Daily Payment Amount as well as the Origination Fee (as set forth above)

received by the Lender prior to the date when Lender receives the Disbursement Amount back from Borrower.

**6. PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount in accordance with the Payment Schedule shown in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to debit required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower also authorizes Lender to otherwise collect amounts owed to it as provided in this Agreement.

**7. ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must either restore sufficient funds such that the missed payment can be collected as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) or promptly send the Lender the amount of the missed payment via wire transfer or by delivering a check. If Borrower elects to send payments by postal mail, then Borrower agrees to send such payments to WebBank c/o Libertas Funding, LLC, 411 W. Putnam Ave., Suite 220, Greenwich, CT 06830, Attn: Customer Service. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower while enrolled in the Automatic Payment Plan makes a payment by mail, or by any pay-by-phone, on-line service, or any other service that Lender makes available, Lender may either treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments as provided in the Payment Schedule or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

**8. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments received on Borrower's Loan between principal, Cost-of-Funds and fees in any manner Lender chooses in Lender's sole discretion.

**9. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any postdated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to WebBank c/o Libertas Funding, LLC, 411 W. Putnam Ave., Suite 220, Greenwich, CT 06830, Attn: Customer Service.**

**10. PREPAYMENT.** Borrower may prepay Borrower's Loan in whole on any Business Day by paying Lender the sum total of the outstanding Total Repayment Amount and any fees as determined by Lender's records in accordance with Section 8. Borrower may prepay Borrower's Loan in part on any Business Day and such payment shall be applied against the Total Repayment Amount and any fees. The Total Repayment Amount shall be reduced by the prepayment factor as set forth on Page 1 of the accompanying Business Loan and Security Agreement Supplement. For example, if the Loan's Factor Rate is 1.30 but the loan is paid off within one (1) month of disbursement/funding, the Factor Rate shall be reduced by the "one-month prepayment factor" as set forth on Page 1 of the accompanying Business Loan and Security Agreement Supplement

**11. SECURITY INTEREST.** Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, related to the Loan described in this Agreement, whether or not contemplated by the parties at the time of the

granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, amounts paid to Borrower or on their behalf, all Cost-of-funds, fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower (and Guarantor, if applicable, pursuant to Section 12) now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card or debit card transactions; (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property including certified and uncertified securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code; and (iii) any and all proceeds of any of the foregoing, including insurance proceeds or other proceeds from the sale, destruction, loss, or other disposition of any of the foregoing, and sums due from a third party who has damaged or destroyed any of the foregoing or from that party's insurer. The security interest Borrower (or Guarantor, if applicable, pursuant to Section 12) grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest. In addition to the Collateral described above, Borrower or Guarantor hereby grant to the Lender a security interest in collateral specified on Schedule 11 (attached hereto and made a part hereof).

**12. PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document required in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral. Borrower and Guarantor each agree that, if any Guarantor is a corporate entity, then Lender or Lender's Representative may file any financing statement, lien entry form or other document against such Guarantor or its property that Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral. Any such Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender or Lender's Representative deems necessary to protect Lender's security interest in the Collateral. In this Agreement, "Lender's Representative" means any entity or individual that is designated by Lender to serve in such capacity.

**13. LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application,(ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about in writing prior to Lender disbursing the Disbursement Amount, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and(v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**14. TAXES, ASSESSMENTS AND LIENS.** Borrower (and Guarantor, if applicable, pursuant to Section 12) will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

**15. INSURANCE.** Borrower (and Guarantor, if applicable, pursuant to Section 12) shall procure and maintain such insurance as Lender may require with respect to the Collateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at

any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense as further provided in Section 18. Borrower (and Guarantor, if applicable, pursuant to Section 12) shall promptly notify Lender of any loss of or damage to the Collateral.

**16. REPAIRS AND MAINTENANCE.** Borrower (and Guarantor, if applicable, pursuant to Section 12) agrees to only use the Collateral for its originally intended purposes and keep and maintain the Collateral in good order, repair and condition at all times, and to cause others to so use, keep, and maintain, while this Agreement remains in effect. Borrower (and Guarantor, if applicable, pursuant to Section 12) further agrees to pay when due all claims for work done on, or services rendered, or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**17. INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Borrower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

**18. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate to protect the Collateral, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19. BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the true and correct legal name of the Borrower is set forth in the application; (v) the aggregate ownership percentage of the Signatories is greater than or equal to fifty percent (50%) of the Borrower's business (if the aggregate ownership percentage is less than fifty percent (50%), the Borrower has furnished evidence that the sworn signatories have the authority to bind the Borrower in entering into this Agreement and all actions contemplated hereby); (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's

# BUSINESS LOAN AND SECURITY AGREEMENT

charter, by- laws or other constating documents, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all constating documents and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its charter, by-laws and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (ix) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral;(x) all information provided by Borrower(s) and/or Guarantor(s) as part of the application process for the Loan was true and complete; (xi) Borrower does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction; and (xii) Borrower is not presently insolvent within the meaning of the Uniform Commercial Code as well as the United States BankruptcyCode.

**20. COST-OF-FUNDS AND FEES.** Borrower agrees to pay in full the Cost-of-Funds set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in this Agreement, Borrower agrees to pay the following fees:

A. Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

B. Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance a payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

C. Bank Block Fee: A Bank Block Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance wherein Lender is blocked or otherwise prevented from accessing Borrower's Designated Bank Account for purposes of a scheduled payment as provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement.

D. Default Waiver Fee; A Default Waiver Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance when Lender, in its sole discretion and without any requirement to do so, agrees to waive an Event of Default.

Payments made by Borrower hereunder will be applied and allocated between Loan principal, Cost-of- funds, and fees in the manner set forth in Section 8.

**21. INTEREST AND FEES EXCEEDING PERMITTED LIMIT**. If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the Cost-of-funds, interest, Origination Fee, or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

**22. ONLINE CUSTOMER PORTAL**. When Borrower signs in with Borrower's valid username and password at https://portal.libertasfunding.com/ Borrower can obtain information about the Borrower's Loan, such as the outstanding balance, transactions and fees. No additional paper statement will be mailed to Borrower. Borrower agrees not to share Borrower's username and password to https://portal.libertasfunding.com/ with any third-party.

**23. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Each Borrower and each Guarantor (if any) authorize Lender to obtain business, and personal credit bureau reports and investigative reports in Borrower's and any Guarantor's name, respectively, in connection with Borrower's application and at any time and from time to time during the term of the Loan, including: for purposes of deciding whether to approve the requested Loan; for any update, renewal, or extension of credit; for any review or other account servicing purposes; for engaging in account or Guaranty collections; and/or any other lawful purpose. Upon Borrower's (or Guarantor's) request, Lender will advise if Lender obtained a credit report and/or investigative report and Lender will give Borrower or Guarantor (if any) the credit bureau's name and address. Each Borrower and each Guarantor (if any) agree to submit current financial information, and any other information requested by Lender in any format requested by Lender in Borrower's name and in the name of each Guarantor, respectively, at any time

# BUSINESS LOAN AND SECURITY AGREEMENT

promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may, but is not required to, report Lender's credit experiences with Borrower and any Guarantor of Borrower's Loan to third parties as permitted by law, including with respect to any Guarantor to consumer credit reporting agencies. Each Borrower and each Guarantor also agree that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Each Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower's and/or any Guarantor's credit record may be submitted to a credit reporting agency (including with respect to any Guarantor to consumer credit reporting agencies) if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder. Borrower and Guarantor acknowledge that any credit reporting on the Loan shall be at the sole discretion of Lender (subject to applicable law) and that Lender has the right to report the Loan to Guarantor's personal credit file (if a natural person) should Guarantor not pay any Obligation pursuant to the guaranty set forth in this Agreement.

**24. ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower and Guarantor shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any Guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security and shall be secured hereby. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**25. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each Guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

**26. TELEPHONE COMMUNICATIONS.** Notwithstanding any current or prior election to opt in or to opt out of receiving telemarketing calls or SMS messages (including text messages) from the Lender, its affiliates, marketing partners, agents and others calling at Lender's request or on its behalf, Borrowers and Guarantors hereby expressly consent to receive calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, and agents calling at Lender's request or on its behalf, arising out of or relating to your application, loan, and/or account, at any telephone numbers (including any cellular or mobile telephone numbers) that Borrowers and/or Guarantors have provided or may provide in the future, or otherwise may be in Lender's possession or that Lender may reasonably associate with your account through skip tracing, caller ID capture or other means. Borrowers and Guarantors agree that such communications may be initiated using an automated telephone dialing system.

**27. INDEMNIFICATION AND LIMITATION OF LIABILITY.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all losses, costs, damage, liabilities, or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. IN NO EVENT WILL WE BE LIABLE FOR ANY CLAIMS ASSERTED BY BORROWER UNDER ANY THEORY OF LAW, INCLUDING ANY TORT OR CONTRACT THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES,

# BUSINESS LOAN AND SECURITY AGREEMENT

EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH BORROWER HEREBY EXPRESSLY WAIVES. This provision shall survive the repayment of the Obligations and the termination of this Agreement.

**28. MERGERS, CONSOLIDATIONS OR SALES.** Borrower represents and agrees that Borrower will not (i) merge or consolidate with or into any other business entity; (ii) enter into any joint venture or partnership with any person, firm or corporation; or (iii) substantially assign its assets to any other business entity or person.

**29. CHANGE IN LEGAL STATUS**. Without Lender's written consent, Borrower represents and agrees that Borrower will not change (i) its name, (ii) its place of business (or if more than one place of business, its chief executive office), (iii) its mailing address, (iv) its organizational identification number, or (v) its type of organization, jurisdiction of organization or other legal structure. Borrower shall promptly notify Lender in writing of any change concerning its organizational identification number.

**30. DEFAULT.** The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment and/or, Borrower fails to pay any Obligations when due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any statement, representation or warranty heretofore, now or hereafter made by Borrower or Guarantor to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9–102 of the Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a material reorganization or arrangement with creditors;(xvii) the entry of any material judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within fifteen (15) days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company or an additional working capital loan without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any Guarantor of Borrower, including denial of any further liability or obligation hereunder;(xxiv) any Guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his

# BUSINESS LOAN AND SECURITY AGREEMENT

guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 50% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling fifty percent (50%) or more of the ownership interests of such entity dies.

**31. RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

B. Accelerate Indebtedness: Lender may declare the entire Obligations immediately due and payable, without notice to Borrower notwithstanding Section 33.

C. Assemble Collateral: Lender may require Borrower and/or Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower and/or Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and/or Guarantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and/or Guarantor after repossession.

D. Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, Guarantor and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity

E. Appoint Receiver: Lender shall have the right to have a Receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The Receiver may serve without bond if permitted by law. Lender's right to the appointment of a Receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

F. Collect Revenues, Apply Accounts: Lender, either itself or through a Receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may

notify account debtors and obligors on any Collateral to make payments directly to Lender.

G. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

H. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

I. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**32. CONSENT TO JURISDICTION AND VENUE.** Subject to Section 33 below, Borrowers and Guarantors each consent to the jurisdiction of the federal and Utah state courts and agree that any action or proceeding to enforce or arising out of this Agreement may only be brought or in the United States District Court for the District of Utah or in any court of the State of Utah, and Borrower and Guarantors waive personal service of process. Borrowers and Guarantors each waive any objections, including *forum non conveniens,* to the bringing of any such proceeding in such jurisdictions.

**33. ARBITRATION.** To the extent that a claim or dispute arises out of, or in relation to this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, Borrower(s) and Guarantor(s) hereby agree that the claim or dispute may be resolved by mandatory binding arbitration in Utah at the sole election of the Lender within thirty (30) days after the claim or dispute arises. If Lender so elects, the parties agree that (i) the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the Expedited Procedures of the JAMS Comprehensive Arbitration Rules and Procedures except as otherwise agreed in this Agreement; (ii) the arbitrator shall be chosen in accordance with the procedures of JAMS and shall base the award on applicable Utah law; (iii) the arbitration shall be conducted by a single arbitrator; (iv) judgment on the award may be entered in any court having jurisdiction, subject to Section 32 above; and (iv) the costs of the arbitration shall be divided equally between the parties. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

**34. NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**35. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrowers may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrowers from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. Libertas Funding, LLC ("Libertas") (in its capacity as Servicer) or a successor servicer (if any) shall, acting solely for this purpose as a non-fiduciary agent of Lender, maintain at one of its offices in the United States a copy of each assignment agreement delivered to it with respect to this Loan and a register for the recordation of the name of each assignee of this Loan, and principal and interest amount of this Loan owing to, such assignee pursuant to the terms hereof. The entries in such register shall be conclusive, and Borrower, Lender and each such assignee may treat each person whose name is recorded therein pursuant to the terms hereof as a "Lender" hereunder for all

purposes of this Agreement, notwithstanding notice to the contrary. The register maintained for this Loan shall be available for inspection by Borrower and any such assignee of this Loan, at any reasonable time upon reasonable prior notice to Libertas (in its capacity as Servicer) or the applicable successor servicer (if any). This Section 35 shall be construed so that this Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related Treasury regulations (or any other relevant or successor provisions of the Internal Revenue Code or of such Treasury regulations).

**36. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only, and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties, having had the opportunity to consult counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**37. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**38. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notice to Lender will be deemed received by Lender at address sent forth in Section 47 (or to any other address as may be specified by either party by a notice given as provided herein), by U.S. mail, postage prepaid, first class mail; in person; by registered mail; by certified mail; by nationally recognized overnight courier; or when sent by electronic mail. Notice to Borrower and/or any personal guarantor will deemed given when sent to Borrower's last known address or electronic mail address in Lender's records for this Loan.

**39. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers),at intervals to be determined by Lender. Lender, or any of its agents, shall have the right to without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower. Lender, or any of its agents, may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third-party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing loans made through such Referring Party's referrals as well as the servicing and collection of Borrower's Loan account. Wherever appropriate in this Agreement, a singular term shall be construed to the mean the plural where necessary, and a plural term the singular. For example, if at any time two parties shall constitute Borrower, then the relevant term shall refer to both parties together.

**40. GOVERNING LAW.** Subject to Section 33 above, our relationship including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with federal law and (to the extent not preempted by federal law) Utah law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Borrower understands and agrees that (i) Lender is located in Utah,(ii) Lender makes all credit decisions from Lender's office in Utah, (iii) the Loan is made in Utah (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in Utah) and (iv) Borrower's payments are not accepted until received by Lender in Utah.

**41. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (*e.g.*, a Guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the

extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may, but will not be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

**42. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender, or its servicing agent, may monitor and/or record telephone calls between Borrower and /or Guarantor and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by e-mail and text.

**43. JURY TRIAL WAIVER AND CLASS ACTION WAIVER.** To the extent not prohibited by applicable law, Borrower, Guarantors and Lender waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

**THE PARTIES HERETO (LENDER, BORROWERS AND GUARANTORS) WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**44. CONFIDENTIALITY.** Borrower and Guarantor (if any) shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents.

**45. ENTIRE AGREEMENT.** The accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto, including any agreement, authorization, or consent, or communication between Borrower or Guarantor (if any) and an Independent Sales Organization that may have referred Borrower to Lender. Notwithstanding any agreement, authorization, or consent, or communication Borrower (or Guarantor if any) and an Independent Sales Organization, Borrower and Guarantor (if any) shall only have opt-out rights with respect to any agreement, authorization, or consent as provided in this Agreement or as otherwise provided in any other agreement, authorization, or consent between Borrower (or Guarantor if any) and Lender or its Servicer, Libertas. If Borrower (or Guarantor if any) wishes to exercise any applicable opt-out right, it must directly contact Lender or Servicer.

**46. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, signatures delivered by electronic or fax transmission shall be treated in all respects as original signatures.

**47. CUSTOMER SERVICE CONTACT INFORMATION.** If you have questions or comments about your Loan, you may contact us by (i) e-mail at Customerservice@libertasfunding.com, (ii) telephone at (800) 704-8675 or (iii) WebBank c/o Libertas Funding, LLC, 411 W. Putnam Ave., Suite 220, Greenwich, CT 06830, Attn: Customer Service.

**48. GRANT OF LICENSE TO USE LIBERTAS CUSTOMER PORTAL.** Subject to Borrower's compliance with this Agreement and the Terms of Use for Libertas' Customer Portal, Borrower is granted a nonexclusive, revocable, non-transferable, non-sublicensable, limited right and royalty-free license to

# BUSINESS LOAN AND SECURITY AGREEMENT

use Libertas' Customer Portal, effective solely during the term of the Loan and so long as an Event of Default has not occurred. The license granted to Borrower is personal, and no rights hereunder may be transferred by Borrower without express written approval. The license granted hereunder may be terminated without notice at any time after an Event of Default has occurred.

**49. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the person signing or affirming below to execute on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understands and agrees to be bound by its terms. Each person signing or affirming below certifies that such person is signing on behalf of the Borrower.

Name of Authorized Signer: Eric Mynhier

Title: BORROWER

Signature of Authorized Signer: Eric Mynhier
Eric Mynhier (Sep 8, 2021 14:25 EDT)

Date: 09-08-2021

Name of Authorized Signer: Eric Mynhier

Title: OWNER

Signature of Authorized Signer: Eric Mynhier
Eric Mynhier (Sep 8, 2021 14:25 EDT)

Date: 09-08-2021

# AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**This Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits") is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.**

**DISBURSMENT OF LOAN PROCEEDS.** By executing this Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits"), Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the business checking account indicated below (or a substitute business checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By executing this Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits"), Borrower agrees to, and hereby, enrolls in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep the Designated Checking Account in good standing or if there are insufficient funds in the Designated Checking Account to process any payment (or if Lender is otherwise unable to collect any amounts by ACH debit owed to Lender under the Loan or under any other loan or extension of credit by Lender to Borrower). **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**Provisional Payment**. Credit given by us to you with respect to an automated clearing house ("ACH") credit entry is provisional until we receive final settlement. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making to you via such entry (i.e. the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**Notice of Receipt of Entry**. Under the operating rules of the National Automated Clearing House Association ("NACHA"), which are applicable to ACH transactions involving your account, we are not required to give next day notice to you of receipt of an ACH item and we will not do so.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower attests that the Designated Checking Account was established for business purposes and not for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this authorization. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law. Borrower agrees to be bound by NACHA rules of the Electronic Payments Association. Borrower agrees to provide to Lender at all times, "Live Contemporaneous Access" to all of its bank accounts in order for Lender to evaluate Borrower's compliance with the Agreement, and for collections in the Event of Default ("Borrower's Accounts"). "Live Contemporaneous Access" shall be defined as: Borrower, at all times and including but not limited to, providing Lender with accurate login information necessary to access all of Borrower's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens. Borrower shall provide notice to Lender in the event Borrower makes any changes to the Designated Checking Account, including in the event Borrower closes the Designated Checking Account.

**Routing Number:** 063114661

**Account Number:** 4002003756

**Tax ID:** 26-3582332

**Authorized Signer:** Eric Mynhier

Title: BORROWER

Signature: Eric Mynhier
Eric Mynhier (Sep 8, 2021 14:25 EDT)

Date: 09-08-2021

**Authorized Signer:** Eric Mynhier

Title: OWNER

Signature: Eric Mynhier
Eric Mynhier (Sep 8, 2021 14:25 EDT)

Date: 09-08-2021

# Guaranty

**THIS GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS FOR GUARANTOR(S). PLEASE READ THE GUARANTY, WHICH INCLUDES THE BUSINESS LOAN AND SECURITY AGREEMENT AND ASSOCIATED SUPPLEMENT, CAREFULLY BEFORE SIGNING.**

Each Guarantor, jointly and severally, absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and all Obligations incurred by the Borrower pursuant to the Agreement and agree to the terms of the Agreement (this "Guaranty"). Each Guarantor further agrees to repay the Obligations on demand, without requiring Lender first to enforce payment against Borrower. This is a guarantee of payment and not of collection. This is an absolute, irrevocable, unconditional, primary, and continuing obligation and will remain in full force and effect until all amounts owed to Lender pursuant to the Agreement are satisfied in full. Each Guarantor represents and warrants that (i) it is a legal resident of the United States of America and (ii) Guarantor does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction.

This Guaranty shall be construed in accordance with the laws of the State of Utah, and shall inure to the benefit of Lender, its successors and assigns. Each Guarantor **agrees that the Guaranty is subject to the Arbitration Agreement set forth above in Section 33**. To the extent not prohibited by applicable law, each of the undersigned Guarantors waives its right to a trial by jury of any claim or cause of action based upon, arising out of or related to this guaranty, the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

Name of Guarantor: Eric Mynhier

Title: Guarantor

Signature of Guarantor: Eric Mynhier
Eric Mynhier (Sep 8, 2021 14:25 EDT)

Date: 09-08-2021

**SCHEDULE 11 (ADDITIONAL PLEDGED COLLATERAL)**

# BorrowerLoanAgreement - ACM Development

Final Audit Report 2021-09-08

| | |
|---|---|
| Created: | 2021-09-08 |
| By: | Ishmamm Nazrul (ishmamm.nazrul@libertasfunding.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAnWX37HyyQP3tvrLF7AndS8S09lXq8YYW |

## "BorrowerLoanAgreement - ACM Development" History

Document created by Ishmamm Nazrul (ishmamm.nazrul@libertasfunding.com)
2021-09-08 - 2:34:34 PM GMT- IP address: 13.110.14.8

Document emailed to Eric Mynhier (acmdevelopmentllc@gmail.com) for signature
2021-09-08 - 2:39:21 PM GMT

Email viewed by Eric Mynhier (acmdevelopmentllc@gmail.com)
2021-09-08 - 5:44:35 PM GMT- IP address: 174.212.38.66

Eric Mynhier (acmdevelopmentllc@gmail.com) has agreed to the terms of use and to do business electronically with Libertas Funding, LLC
2021-09-08 - 6:25:31 PM GMT- IP address: 68.204.70.217

Document e-signed by Eric Mynhier (acmdevelopmentllc@gmail.com)
Signature Date: 2021-09-08 - 6:25:31 PM GMT - Time Source: server- IP address: 68.204.70.217

Agreement completed.
2021-09-08 - 6:25:31 PM GMT

# EXHIBIT "C"

**FINANCING STATEMENT FORM**

A. NAME & DAYTIME PHONE NUMBER OF CONTACT PERSON
Wolters Kluwer Lien Solutions; (800)331-3282
Email ctlsweback@wolterskluwer.com

B. SEND ACKNOWLEDGEMENT TO:

**FILED**

2021 Sep 10 01:34 PM

******* 202108411203 *******

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

**1. DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (1a OR 1b) - Do Not Abbreviate or Combine Names

| 1a. ORGANIZATION'S NAME | | | | | |
|---|---|---|---|---|---|
| ACM DEVELOPMENT, LLC | | | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | | |
| 1c. MAILING ADDRESS Line One: 562 Bowness Avenue | This space not available. | | | | |
| MAILING ADDRESS Line Two | CITY: Ocoee | STATE: FL | POSTAL CODE: 34761 | COUNTRY: USA | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - INSERT ONLY ONE DEBTOR NAME (2a OR 2b) - Do Not Abbreviate or Combine Names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
| 2c. MAILING ADDRESS Line One | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY | STATE | POSTAL CODE | COUNTRY |

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - INSERT ONLY ONE SECURED PARTY NAME (3a OR 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| C T CORPORATION SYSTEM, AS REPRESENTATIVE | | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
| 3c. MAILING ADDRESS Line One: 330 N Brand Blvd, Suite 700; Attn: SPRS | This space not available. | | | |
| MAILING ADDRESS Line Two | CITY: Glendale | STATE: CA | POSTAL CODE: 91203 | COUNTRY: USA |

**4. This FINANCING STATEMENT covers the following collateral:**

All assets of the Debtor now owned or hereafter acquired and wherever located, including, but not limited to, any and all receivables, equipment, fixtures, inventory, accounts, credit card receivables, chattel paper, documents, instruments, investment property, general intangibles, letter-of-credit rights and deposit accounts, together with any products and proceeds thereof.

5. ALTERNATE DESIGNATION (if applicable)
☐ LESSEE/LESSOR ☐ CONSIGNEE/CONSIGNOR ☐ BAILEE/BAILOR
☐ AG LIEN ☐ NON-UCC FILING ☐ SELLER/BUYER

**6. Florida DOCUMENTARY STAMP TAX** - YOU ARE REQUIRED TO CHECK **EXACTLY ONE** BOX

☑ All documentary stamps due and payable or to become due and payable pursuant to s. 201.22 F.S., have been paid.
☐ Florida Documentary Stamp Tax is not required.

**7. OPTIONAL FILER REFERENCE DATA** 82374883-62145661